

DESIGN RESEARCH ENGINEERING
46475 Desoto Court
Novi, Michigan 48377
Tel: (248) 668 - 3450
Fax: (248) 668 - 3460

February 13, 2007

Mr. Raymond Perez
Wilson, Elser, Moskowitz, Edelman & Dicker
3 Gannett Drive
White Plains, NY 10604-3407

Subject: Kokins, Karen v. Teleflex, Inc.

Dear Mr. Perez:

At your request, Design Research Engineering (DRE) has analyzed the facts and circumstances of an accident involving a 1996 19 ft Boston Whaler Guardian used by the city of Westminster as a patrol boat. The accident occurred on July 6, 2004, on Standley Lake, in Westminster, Colorado.

I am presently, and have been, a naval architect and mechanical engineer for the last thirty-four years. During my career I have been involved with design, design analysis, and accident reconstruction specializing in maritime issues. As a naval architect and mechanical engineer, I have substantial expertise relating to accident reconstruction and the design and function of recreational planing boats. I have studied their design, engine specifications and capacity, method of propulsion, stability, structure, maneuverability, and mode of operation. A copy of my professional Curriculum Vitae is enclosed.

I have been qualified in both state and federal courts to testify in the areas including accident reconstruction, naval architecture, risk analysis, and recreational boat and marine vessel design and operation.

Regarding this matter, I have reviewed the following project specific material:

    Complaint
    Amended Complaint
    Summons
    Depositions and deposition exhibits of:
        Seth Bayer
        Jason Burandt
        Bastiann Cornelissen
        Robert Friedlander
        Karen Fuller
        John Reddinger
        Walter Sandbeck
        David Wolfe
    Plaintiffs' Responses to Interrogatories and Requests for Production of Documents



EXHIBIT 1

Defendant's Amended Answer to Amended Complaint
Plaintiff's F.R.C.P. 26(a)(2) Expert Witness Disclosures
Westminster Incident Report
City of Westminster Supervisor's Supplemental Incident Report
Photographs by Jacobson Forensic Engineering
Photographs by Wolfe
Photographs by Larson
Video by Larson
Marine Products Standard Bezel Kit Instructions
Marine Products No Feedback Helm Instructions
DRE photographs, video, and inspection notes

During the time of my involvement in this case, DRE had the opportunity to inspect the subject boat and steering cable. Over the course of my career, DRE has tested numerous recreational boats and has inspected similar cables. I am familiar with the operation, handling, and performance characteristics of recreational boats and with the design and functioning of Teleflex steering cables.

Based on review of the above material, I have the following understanding of testimony related to the incident:

On July 6, 2004, Karen Kokins was riding as a passenger in a Boston Whaler, working as a Park Ranger for the city of Westminster on Standley Lake. Jason Burandt, also a Park Ranger, was at the helm of the patrol boat.

According to Kokins deposition, after towing a disabled vessel to the boat ramp, Burandt suggested that they patrol the lake while they were out on the boat. At the time, Burandt was her supervisor and she felt obligated to remain onboard. Kokins stood behind Burandt while underway. Neither was wearing a PFD, and according to Kokins, none were available onboard. While they were patrolling, the boat took a sharp turn to the right, throwing both parties overboard. Kokins was thrown over the left rear of the vessel. She recounts that it felt like the boat was going about 38 mph, or in agreement with Burandt's statement. When Kokins was ejected, something grabbed onto her ankle and she struck her head.

According to Jason Burandt's statement, taking the boat around the lake at full throttle was a standard operating procedure in an effort to rid the motor of any built up oil and/or gas due to the previous tow. During a gradual turn to starboard, he felt something in the steering snap. They were immediately in a tight spin. He tried to turn the steering wheel to overcome the spin but was unsuccessful. He then pulled back on the throttle. Moments later, while the boat was going approximately 38 mph, he was ejected from the boat over the port side.

Upon making sure that Kokins was OK, Burandt swam to the slow running boat, climbed aboard and pulled the kill switch, which he wasn't wearing at the time of the accident.



He then hoisted Kokins into the boat to assess her injuries. He determined that she had sustained an ankle injury and flagged down another vessel.

They were then taken to the hospital where it was determined that Kokins had sustained injuries to her lower left leg, her vaginal area, and to the back of her head.

In his deposition, Jason Burandt also adds that the throttle lever was broken during the accident because he was holding onto it when he was thrown overboard. He stated that there were PFDs onboard at the time of the accident, but that neither of them was wearing one. With regards to their speed of 38 mph, Burandt did not read it off the speedometer; he knows that the boat cruises at that speed. After the accident, the boat did not stop. It was traveling in a slow circle. Burandt believes he was able to decrease the throttle before being thrown overboard but was not able to get the boat into neutral. Burandt did not inspect the cable after the accident, but he did test the steering wheel and it spun freely in either direction.

As a result of my review of the materials identified above, my inspection, and an analysis of the events, I offer the following opinions:

1. Robert Friedman removed the accident involved steering cable without adequately documenting the condition, routing, placement, and any obstructions in the boat which may have contributed to failure of the steering cable as installed. Friedman also neglected to notify Teleflex of his intensions for the cable. This is a violation of the standards of care posed by the American Society for Testing and Materials (ASTM) for inspection of evidence that may be involved in product liability litigation (Designation: E 1188 – 05).

2. Plaintiff's experts Seth Bayer and Bastiann Cornelissen further materially altered the condition of the steering cable after it was removed from the boat. Potential damage to the cable in the vicinity of the failure involved cutting of the cable prior to documenting its condition. Bayer and Cornelissen also neglected to notify Teleflex of their intensions for the cable. This is a violation of the standards of care posed by ASTM for inspection of evidence that may be involved in product liability litigation.

3. It should be noted that the violations of the standards of care posed by ASTM for inspection of evidence could have and should have been avoided. In the case of Robert Friedman, first and foremost, before removing the cable he should have contacted Teleflex to inform them of his intensions to do so. Had it been collectively deemed necessary to remove the cable, Friedman should have first adequately documented the cable as alluded to in item 1. Upon completion of this task, Friedman should have removed the cable from the vessel in a non-destructive manner. This is feasible and even Plaintiff's expert Seth Bayer testified that it is not necessary to cut the cable in order to remove it. With respect to the actions of Bayer and Cornelissen, non-destructive testing should have been performed. Using an x-ray to inspect the interior of the cable could have been done without the presence of a representative from Teleflex. If it was deemed



necessary to perform destructive testing, it would have been imperative for Bayer and/or Cornelissen to contact Teleflex to agree on a test protocol as well as allow for Teleflex representation at such testing.

4. Inspection of the steering cable showed that the cable is labeled model SSC 6217. Made by Teleflex. Indications show the cable to be manufactured the 123rd day of 1996 (May 2nd) and that the cable is rated as 17 feet long. The helm was dated May 20, 1996. The HIN number on the accident-involved boat shows that the boat was manufactured in June of 1996. Therefore, it appears that the cable and helm were manufactured before the boat and are of suitable vintage. This implies that the steering cable and helm likely were the original components installed on the boat.

5. Based on my inspection, I have the following observations and opinions regarding the condition of the steering cable:

   a. The steering cable is fractured about 20-¼ inches from the end of the telescopic section of the steering system.

   b. With the motor placed in the straight-ahead position, the location of the fracture would be nearly lined up with the end of the swaged end of the telescopic tube and the exposed cable sheath.

   c. The fracture of the spiral winding on the cable occurred due to local corrosion of the lay wires in the cable core. The area of corrosion extends over only about 1 inch of the steering cable. Within about three wraps of the spiral winding in either direction from the break, the cable is in satisfactory condition. This leads to the conclusion that the upset and contamination was likely very local in nature and was in close proximity to the failure.

   d. The remainder of cable, apart from the 1 inch of corrosion, appears to be in good shape. The interior lay wires are intact and whole, and the external spiral wound wire is intact and round.

   e. The cable shows signs of abundant amounts of black grease located primarily at the two ends of the cable. The grease had become quite hard, particularly in the vicinity of the fracture. The exact influence of this foreign material on the fracture is not yet known.

   f. The steering cable also shows signs of original factory installed white grease in the areas where black grease was not present.

   g. The cable sheath is permanently bent approximately ¼ inch over the first 3 inches where it joins the telescopic end. This is evidence that the cable has been bent or was installed with a bend right at the telescopic end.



    h. The spiral windings near the failure show signs of abrasion against the inside of the cable sheath. This abrasion is linear in nature and the scratch patterns are parallel with the cable axis. The abrasion is so severe that the original and normally round wire shape of the spiral winding has been flattened on the outer diameter and portions of the spiral winding have been worn away. This is evidence of extreme lateral contact between the spiral winding and the inside of the outer sheath. Black grease is imbedded between the spiral windings and imbedded within the windings. It too has taken the shape of the flattened outer surface of the spiral windings.

    i. The inside of the outer sheath in the region where the failure slides back and forth with steering input is also scratched and abraded. This shows that high lateral contact forces occurred during the operation of this cable.

    j. The wear pattern on the cable inside of the sheath and deformation of the sheath are consistent with there being a tight radius bend at the terminus of the sheath into the telescoping end.

    k. The inside of the sheath is broken at the location of the joint with the metal telescopic end, and corrosion of the sheath wires was observed. Damage of this sort is also consistent with extreme bending of the cable at the supported end. This is also likely the source of water leakage into this region of the cable. This is the region where the failure of the cable occurred.

    l. The next portion of the sheath, a piece approximately 8 inches long, also shows a permanent set and bend, even though the cable has been removed from this section. The inside of this portion of the sheath also shows scoring from lateral contact with the cable, but the scoring decreases with distance away from the fracture. This section of sheath would have been attached to the telescopic end of the sheath, but it had been severed by the plaintiff's expert. However, even after being cut from the telescopic end, the sheath is still permanently bent. This is further indication that the cable as installed was severely bent at its juncture with the telescopic end.

6. The current steering cable installed on the accident-involved boat is longer than the accident-involved steering cable. Markings that identify the length of the cable have been scratched, but it has been observed to be 18 feet long. Therefore, it is longer that the accident-involved steering cable.

7. If the accident-involved cable was indeed too short, this could provide an explanation for the cable bending at the junction with the telescopic end. Again, the plaintiff experts should have notified Teleflex prior to their cutting and removal of the accident-involved cable. In addition, they should have documented the as-installed cable routing prior to removal.

8. The cable and sheath show signs of having been installed with a severe bend at the



6

telescopic end. The minimum bend radius specified by Teleflex for installation of this cable is 8 inches. It appears that the failed cable may have been installed with a smaller radius or was bent to a tighter radius in service. This bend caused the cable sheath to fail and leak, and the leaking water caused the cable to locally corrode.

9. Recent surveys of marine cables confirm that the Teleflex cable installed on the 1996 Boston Whaler Guardian is consistent with industry standards. The vast majority of marine cables still contain some carbon steel components.

10. Teleflex's installation instructions for steering cables states: "Inspect steering cable periodically for cracks or other damage. If any are found the cable must be replaced." There were locations where nicks and gouges were present on the sheath. If the cable had been replaced as per the instructions, this accident would not have occurred.

11. The American Boat & Yacht Council (ABYC) guideline P-17 Ap.P-17.2.2 recommends the following: "Check the outside covering of steering cables for cracks or cuts. If any are found, replace the cable. Do not cover it with tape." Had this guideline been adhered to and appropriate checks been performed on the sheath of the accident-involved steering cable, the cable would have been removed and this accident would not have occurred.

12. It is noted that when Robert Friedlander cut through the steering cable in an effort to remove it, his incision was made very close to the area of corrosion. It is possible that evidence of water entrance was compromised at this time, contaminating the evidence.

13. In my opinion, the failure of the steering cable appears to be due to improper installation or abuse in service that caused a severe bend to occur at the end of the telescopic section. This bend caused the internal sheath to separate and subsequently water to enter the sheath and allow corrosion of the cable. Further evidence of this is the permanent bend in the sheath, wear on the inside of the sheath, wear and flattening of the spiral windings on the cable in a very short distance while the remainder of the cable does not show similar signs of wear, and additional grease packed into this end of the cable.

14. The Teleflex steering cable is not defectively designed.

The above findings, analyses, and opinions are based on my review of the material cited above. If other additional material becomes available, further analysis may be undertaken as well.

Sincerely,
DESIGN RESEARCH ENGINEERING

ROBERT K. TAYLOR, P.E.
PRINCIPAL ENGINEER

Enclosure

